UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOSHUA SNIDER,

                    Plaintiff,                   Case No. 1:20-cv-648

v.                                     Honorable Paul L. Maloney

CORIZON MEDICAL et al.,

                    Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Either on its own or on motion of a party, the Court may at any time add or drop a party because of misjoinder. Fed. R. Civ. P. 21. In addition, under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will drop Defendants Oversmith, Traler, and Jex on grounds of misjoinder. The Court will also dismiss Plaintiff's federal claims against Defendants Davis, Moore, Maranka, and Saad for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). In addition, the Court will dismiss without prejudice Plaintiff's state-law claim against Defendant Saad. Further, the Court will dismiss as

duplicative the Unknown Party (Chief of Bureau of Health Care Services).  The Court will also dismiss, for failure to state a claim, Plaintiff's due-process and right-to-petition claims against Defendants Lebarre and Gaskill.   Plaintiff's Eighth Amendment claims against Defendants Corizon, Schmidt, Lebarre, Tripple, Dolittle, Calkins, Beechler, Gaskill, Huyge, and McIntyre remain in the case.

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan.  The events about which Plaintiff complains occurred at that facility.  Plaintiff sues medical provider Corizon, Inc., and the following Corizon employees:  Health Unit Manager Jody Lebarre; Doctors Unknown Schmidt and Saad; Physician's Assistant (PA) Huyge; Nurses Unknown Calkins, Unknown Beechler, Unknown Moore; Unknown Dolittle, and Unknown Tripple; Health Supervisor Unknown Gaskill; and Mental Health Unit Chief Unknown Maranka.  Plaintiff also sues the Chief of the MDOC Bureau of Health Care Services, Carmen M. McIntyre.  In addition, Plaintiff sues the following custody staff at ICF:   Warden John Davis; Assistant Deputy Warden (ADW) Unknown Traler; Resident Unit Manager (RUM) Unknown Oversmith; and Assistant Resident Unit Supervisor Matthrw [sic] Jex.

According to the amended complaint, the MDOC diagnosed Plaintiff on March 11, 2016, with gender identity disorder (GID), and Plaintiff was classified as a transgender prisoner with female body parts.[1]  In addition, by the age of 17 years, prior to her entry into the prison

---

[1] In the complaint and amended complaint, Plaintiff uses a variety of pronouns, most frequently, the compound pronoun "he/she."  For clarity and uniformity, the Court hereafter will use the pronouns 'she' and "her" to reflect the gender identity for which Plaintiff is receiving hormone therapy.

system, Plaintiff was diagnosed with bipolar disorder, attention deficit hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD).

Plaintiff arrived at ICF on August 13, 2019, and was placed in the START NOW program.[2] She was receiving female hormone treatment when she arrived. Shortly after her arrival, Plaintiff began to experience severe migraines and discovered hard, painful lumps in her breast. Plaintiff sent a kite to Defendant Lebarre, describing the painful lumps. On August 25, 2019, Defendant Moore examine Plaintiff and discovered the lumps. Defendant Moore advised Plaintiff that the examination report would be sent to Defendant Huyge for a chart review.

On August 29, 2019, Plaintiff began to experience severe chest pain. Nurse Unknown Jones (not a Defendant) examined Plaintiff. Plaintiff asked Nurse Jones about the chart review that Defendant Huyge was supposed to perform. Nurse Jones told Plaintiff that no appointments were set up and Defendant Moore had never filed a report about the examination. Plaintiff experienced an anxiety attack, depression, and thoughts of self-harm.

On an unspecified date in August, Plaintiff sent another kite to Defendant Lebarre, advising that the lumps in her breast had gotten worse and explaining that she needed to be seen. On September 1, 2019, Plaintiff was placed on suicide watch, because of her thoughts of self-harm, arising out of the alleged failures of Defendants Huyge, Lebarre, and Gaskill to provide her medical attention for the breast lumps. Plaintiff was released from suicide watch on September 5, 2019. During the evening medication line, Defendant Tripple refused to give Plaintiff her hormone therapy.

---

[2] The START Program is an alternative-to-segregation program, providing "a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting." MDOC Director's Office Memorandum (DOM) 2020-20 (eff. Jan. 1, 2020).

Plaintiff again began to experience depression and thoughts of self-harm.  She wrote a kite to Defendant Lebarre, explaining that the nurse had refused her hormone therapy.  At the morning med line on September 7, 2019, Plaintiff was again denied her hormone therapy, this time by Defendant Calkins.  Plaintiff started having hot flashes and migraines, and she began to throw up.  Defendant Beechler denied Plaintiff her hormone medications for the third time at the evening med line.  Beechler told Plaintiff that she did not like Plaintiff and that Plaintiff needed to die.  Plaintiff complains that she experienced another panic attack.

After five days of suffering migraines, anxiety attacks, depression, hot flashes, and increasingly painful lumps in her breast, Plaintiff finally was issued her hormone medication.  Plaintiff alleges that Defendants Lebarre, Tripple, Beechler, and Calkins engaged in intentional infliction of emotional distress and were deliberately indifferent to Plaintiff's serious physical and mental illness over the five-day period.  Plaintiff wrote a grievance against Lebarre, Huyge, Beechler, and Tripple.

On September 25, 2019, Plaintiff met with Defendant Nurse Dolittle, who refused to examine the lumps in Plaintiff's breast.  Dolittle also stated that Plaintiff was a man and that Defendant Huyge therefore had no obligation to examine Plaintiff's breasts.  Plaintiff experienced an anxiety attack with chest pains.  Later that afternoon, Defendant Tripple refused to issue Plaintiff her psychiatric medications.  Tripple told Plaintiff that she had a penis and needed to act like it.  Plaintiff again experienced depression and thoughts of self-harm.

Plaintiff wrote to the chief of Corizon, Inc. on September 27, 2019, complaining about the lack of care from Defendants Schmidt, Lebarre, and Huyge.  That same day, she wrote a kite to Defendants Lebarre, Gaskill, and Huyge, advising them that her GID was not being properly treated and that Defendant Dolittle had refused to examine her.  Nurse Sikkema (not a

4

Defendant) examined Plaintiff on September 30, 2019. Sikkema felt the lumps in Plaintiff's breast and told Plaintiff that he would send the medical chart to Defendant Huyge.

On October 6, 2020, while Defendant Calkins was making medical rounds, Plaintiff informed Calkins that she was having chest pain. Calkins ignored Plaintiff.

Plaintiff wrote to Defendant Huyge on October 10, 2019, complaining that Huyge had not seen Plaintiff, despite being aware of the issues and serious needs Plaintiff faced. Plaintiff was examined by Nurse Fletcher (not a Defendant) on October 23, 2019. Fletcher performed a full physical, weighed Plaintiff, felt the lumps in Plaintiff's breast, and advised Plaintiff that she would send the medical chart to Defendant Huyge.

Plaintiff wrote to Defendant Warden Davis on November 5, 2019, stating that she was a GID prisoner on female hormones whose serious medical needs were being ignored by medical staff. Plaintiff asked to be transferred to another facility to get proper medical treatment.

Plaintiff alleges that she continued to be denied her psychiatric medications. On November 13, 2019, Plaintiff had a seizure, and her right palm and pinky finger went completely numb.

On November 19, 2019, Defendant Calkins issued Plaintiff's psychiatric medications, but they had been crushed and floated in the water. Plaintiff spoke with Dr. Shafer (not a Defendant) about the crushed medication on November 20, 2019. Dr. Shafer investigated, allegedly prompting health care officials to lie and say that they had found a stash of psychiatric medications in Plaintiff's cell. Plaintiff alleges that Defendants lied in retaliation for Plaintiff having filed grievances and kites.

After three months of attempting to get an appointment with Defendant Huyge, Plaintiff finally met with Huyge on November 22. Defendant Huyge informed Plaintiff that the

GID issue was new to all of the ICF health care officials, including himself, Lebarre, Tripple, Dolittle, Beechler, and Calkins.  Huyge told Plaintiff that none of them were trained in the disorder and that Defendant Schmidt had been made head of the Gender Dysphoria Committee in Lansing. Defendant Huyge ordered lab tests and weighed Plaintiff, but Huyge refused to check the lumps in Plaintiff's breast.  Later that night, Plaintiff suffered another seizure.  Plaintiff's right hand became completely numb.  Plaintiff told an unknown correctional officer that she needed immediate medical attention, but she was ignored.  Plaintiff wrote kites to Defendant Huyge, Lebarre, and Gaskill, telling them that she could no longer feel her right hand.

On December 4, 2019, Nurse Fletcher examined Plaintiff's hand.  Fletcher informed Plaintiff that she would send Plaintiff's medical chart to Defendant Huyge.  Plaintiff wrote a kite to Defendant Maranka, the head of the ICF mental health unit.  Plaintiff asked Maranka to email Dr. Schmidt in Lansing, so that Plaintiff could get proper medical attention.

Plaintiff was scheduled to have a nurse callout on December 12, 2019, so that her blood draws could be done.  Plaintiff was never called out and never saw a nurse.  The following day, Plaintiff wrote to Defendant Health Care Supervisor Gaskill, complaining that she had not had her lab work completed.  Later that day, she had another panic attack.  After eight days of panic, depression, and thoughts of self-harm, Plaintiff finally had her blood drawn on December 20, 2019.

Plaintiff wrote Defendant Lebarre on December 21, 2019, complaining that she had been trying to get proper medical care for three months, but nothing had been done about the lumps in her breast and her other medical issues.  Plaintiff wrote to Defendant Huyge on December 31, 2019, informing him that she was supposed to have been seen on December 4, 2019, and asking why she was being denied medical care.

On January 5, 2020, Plaintiff wrote Defendant Oversmith, complaining that, as a prisoner with GID, she was being improperly denied the use of a single-person shower. Plaintiff complained that the use of the common shower exposed her breasts to male prisoners. Plaintiff talked to Defendant Oversmith on January 17, 2020, informing her that Plaintiff had a private-shower detail as an accommodation for her GID, but she was not receiving a private shower. Defendant Oversmith informed Plaintiff that she would transfer Plaintiff to a unit with a private shower. Oversmith, however, never took action on the promise.

On January 6, 2020, Plaintiff wrote a complaint to Defendant MDOC Chief of Health Care Services McIntyre, advising her of the ICF Defendants' failures to treat Plaintiff and complaining about their lack of training to do so. Plaintiff also complained that Defendant Schmidt had failed to take action on Plaintiff's medical needs, despite being fully aware of the serious risks faced by Plaintiff.

Plaintiff wrote another kite to Defendant Maranka on January 8, 2020, again asking Maranka to email Dr. Schmidt to get Plaintiff medical treatment. Plaintiff received a response from Defendant Maranka, in which Maranka refused Plaintiff's request.

On January 9, 2020, Plaintiff wrote a kite to Defendant Lebarre, asking her to arrange a telemedicine visit with Dr. Schmidt. On January 17, 2020, Plaintiff was placed on modified grievance access.

On both January 23 and January 30, 2020, Plaintiff had a scheduled nurse callout to see the GID doctor, to address her medical issues. Both callouts were cancelled. Plaintiff had another anxiety attack with chest pain. She submitted grievances on Defendants Lebarre, Huyge, and Gaskill on January 26 and February 1, 2020, complaining that Defendants were intentionally

making her suffer.   The grievance was denied.   In addition, Plaintiff remained on modified grievance access.

On February 3, 2020, after five months of complaints, Plaintiff finally saw PA Donna Rohr (not a Defendant).  Rohr performed a full physical, to try to determine why Plaintiff's weight kept changing and her breast hurt.  Rohr read the lab reports to Plaintiff, explaining that Plaintiff's T-block hormone level was high and other hormone was low.  Rohr told Plaintiff that she would convey the information to Dr. Schmidt and recommend a different hormone therapy.

Plaintiff wrote Defendant Lebarre on February 9, 2020, advising Lebarre that Plaintiff's hormone level was low and asking Lebarre to email Defendant Schmidt so that Plaintiff could be placed on a different hormone therapy.

Plaintiff saw Nurse Fletcher of February 18, 2020, for follow-up on the numbness in Plaintiff's right hand.   Plaintiff complains that Defendant Huyge had been aware of the numbness for some time but failed to address it.   Nurse Fletcher advised that she would send Plaintiff's medical chart to Defendant Huyge.

Sometime in February, Plaintiff wrote the ICF transfer coordinator, asking if she was on the transfer list.  Plaintiff was informed that she was not on the list.  Plaintiff contends that Defendant Oversmith lied about her intent to resolve Plaintiff's shower issues.

On February 27, 2020, Plaintiff wrote Defendant Maranka, advising Maranka of Plaintiff's health issues and again requesting that Maranka contact either Defendant Schmidt or the GID Committee about Plaintiff's needs.

Plaintiff wrote a kite to Defendants Lebarre, Gaskill, and Huyge on February 29, 2020, informing them that she was losing breast tissue.

8

On March 4, 2020, Defendant Jex moved Plaintiff into a cell that typically was used to punish inmates, purportedly because Plaintiff had filed many grievances.  The cell had a metal cage over the window, no electrical outlet, and no heat.  Plaintiff became extremely cold.  She talked to Sergeants Kassa and Kerr (not Defendants) about Defendant Jex, but apparently received no relief.  As a result of the low temperature of the cell, Plaintiff contracted a bad cold.  Defendant Jex did not move Plaintiff out of the cell until April 6, 2020.

Plaintiff saw Defendant Huyge on March 9, 2020.  Plaintiff explained all of her issues, including the numbness in her right hand.  Defendant Huyge performed no examination or tests.  Plaintiff had another severe anxiety attack after the visit.

On March 23, 2020, Plaintiff attempted to write a grievance on Defendant Jex, Sergeant Kassa, and Sergeant Kerr, complaining about her cell conditions, including the lack of a heating vent, lack of an outlet, and extreme cold.  Plaintiff's grievance was denied.

Defendant Huyge made medical rounds on the unit on March 27, 2020.  Plaintiff asked Defendant Huyge to contact Dr. Schmidt or someone from the GID committee about Plaintiff's T-blocker-level being high.  Defendant Huyge laughed at Plaintiff and refused to help.

Plaintiff wrote another kite to Defendants Lebarre, Gaskill, and Huyge on May 30, 2020.  Plaintiff again raised the issue of her T-blocker-level being high, her hormones being low, her breast becoming worse and more painful.  Plaintiff asked to be seen by Dr. Schmidt or another specialist.  On June 1, 2020, Defendant Lebarre finally agreed to reach out to Defendant Schmidt so that Plaintiff could receive proper medical treatment for her conditions.

On June 21, 2020, Plaintiff spoke with Defendant Psychiatrist Dr. Saad, asking Saad to email Defendant Schmidt to address Plaintiff's medical issues related to her GID.  Defendant Saad refused to do so.  Plaintiff alleges that she had told Defendant Saad about the

issues for three months, but Saad always refused to take action.  After meeting with Saad on June 21, 2020, Plaintiff suffered another severe anxiety attack.  Plaintiff was placed on modified grievance access on June 25, 2020.

On July 9, 2020, Plaintiff finally saw Defendant Huyge again.  Huyge read Plaintiff's December 20, 2021, lab draws back to Plaintiff.  Despite the fact that the lab draws showed low female hormones and high t-block-levels, no action was taken.  Defendant Huyge refused to examine Plaintiff's painful breast.

Plaintiff contends that Defendants Corizon, McIntyre, and Schmidt failed to respond to her repeated attempts to obtain health care and failed to train ICF medical personnel in the care of prisoners with GID who were taking hormones.  Plaintiff also alleges that these Defendants failed to train and supervise Defendant ICF medical providers Lebarre, Tripple, Dolittle, Calkins, Beechler, Moore, and Gaskill, despite direct knowledge that the ICF health care Defendants did not know how to treat prisoners with GID who were undergoing hormone treatment, including Plaintiff.  Further, Plaintiff alleges that Defendants Corizon, McIntyre, and Schmidt had direct knowledge of Plaintiff's ongoing condition, but refused to take action to correct it.

Plaintiff contends that Defendants' actions violated her rights by retaliating against her for filing grievances and kites, in violation of the First Amendment.  She also alleges that Defendants' actions demonstrated deliberate indifference to her serious medical needs and conditions of confinement, in violation of the Eighth, and Amendment.  Further, Plaintiff alleges that Defendants violated the Fourteenth Amendment, presumably the Due Process Clause, by mishandling or rejecting her grievances.  In addition, Plaintiff alleges that Defendant Saad, by not

helping Plaintiff with treatment for her physical condition of GID, committed the state tort of intentional infliction of emotional distress.

Plaintiff has filed a motion for temporary restraining order and preliminary injunctive relief (ECF No. 2). She also seeks declaratory relief, together with compensatory and punitive damages.[3]

## II.    Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Rule 18(a) states: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .

> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

---

[3] Plaintiff's demands for relief are set forth in a section entitled "Prayer for Relief" on the last page of the original complaint. (Compl., ECF No. 1, PageID.24.) Plaintiff's amended complaint does not contain a specific prayer for relief. However, by express reference, Plaintiff indicates her intent to seek the same relief as that stated in the original complaint. (Am. Compl., ECF No. 7, PageID.92.)

7 Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure Civil § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), and *Garcia v. Munoz*, No. 08-1648, 2007 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also Neitzke v. Williams*, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778. When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form. *See* 28 U.S.C. § 1915(b)(1). These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation by making all prisoner litigants feel the deterrent effect created by liability for filing fees." *Williams v. Roberts*, 116 F.3d 1126, 1127-28 (5th Cir. 1997). The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in

forma pauperis, unless the statutory exception is satisfied.  28 U.S.C. § 1915(g).  The "three

strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation.  *See Wilson*

*v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like plaintiff may not join in one

complaint all of the defendants against whom she may have a claim, unless the prisoner satisfies

the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant
> 1 should not be joined with unrelated Claim B against Defendant 2.  Unrelated
> claims against different defendants belong in different suits, not only to prevent the
> sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to
> ensure that prisoners pay the required filing fees--for the Prison Litigation Reform
> Act limits to 3 the number of frivolous suits or appeals that any prisoner may file
> without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person--say, a suit
> complaining that A defrauded the plaintiff, B defamed him, C punched him, D
> failed to pay a debt, and E infringed his copyright, all in different
> transactions--should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166,

168-69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based

on actions taken after the filing of his original complaint would have defeated the purpose of the

three strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998);

*Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001)

(declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing

fee, because it "would improperly circumvent the express language and clear intent of the 'three

strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's

request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to

circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of

obtaining a "strike" under the "three strikes" rule).  To allow Plaintiff to proceed with these

improperly joined claims and defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike" for purposes of by § 1915(g), should any of her claims turn out to be frivolous.

Corizon Health is the first Defendant named in the action, and Plaintiff principally complains about the inadequate medical care she has received for her various physical and psychological health needs. She names the many individual health care providers who have denied her care: Defendants Schmidt, Lebarre, Tripple, Dolittle, Calkins, Beechler, Moore, McIntyre,[4] Gaskill, Huyge, Maranka, and Saad. Plaintiff also alleges that Defendant Davis, as warden of ICF, is responsible for the denial of health care, on the ground that Plaintiff wrote a kite to Defendant Davis, complaining about her lack of treatment and that Defendant Davis took no action to correct the problem. Plaintiff makes no allegations against any other Defendant (Defendants Traler, Oversmith, and Jex) that are related to the failure to provide her health care. As a result, no claims against Defendants Traler,[5] Oversmith, and Jex are related to her claim against Defendant Corizon Health and the other health care Defendants.

Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572-73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'"); *DirecTV,*

---

[4] Plaintiff also names the unknown Chief of the Bureau of Health Care Services (Unknown Party) as a Defendant. However, because Plaintiff has separately named Carmen McIntyre, the Chief of the MDOC Bureau of Health Care Services, the separate naming of the Unknown Party is duplicative.

[5] Indeed, Plaintiff fails entirely to mention Defendant Traler in the body of her complaint.

*Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate.").   "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'"  *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties."  *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845.  Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice.  *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846-47; *Michaels Bldg. Co.*, 848 F.2d at 682.

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983.  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years.  *See* Mich. Comp. Laws § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999).  Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice."  *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

All of the actions about which Plaintiff complains occurred in 2019 and 2020, well within the three-year period of limitations.  Those claims are not at risk of being time-barred.

Plaintiff therefore will not suffer gratuitous harm if the improperly joined Defendants are dismissed.  Accordingly, the Court will exercise its discretion under Rule 21 and dismiss Defendants Trayler, Oversmith, and Jex from the action, without prejudice to the institution of new, separate lawsuits by Plaintiff against those Defendants.[6]  *See Coughlin*, 130 F.3d at 1350  ("In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL 485204, at *3 (same).

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

---

[6] As fully discussed in this opinion, Plaintiff is cautioned that she must limit all future actions to Defendants who are transactionally related to one another.

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## IV.    Supervisory Liability

Plaintiff alleges that she sent a kite to Defendant Davis, complaining about the lack of medical care to address her physical and psychological health needs related to her GID. She requested a transfer to another prison, to ensure that she received better care. Plaintiff suggests that Defendant Davis is liable for the failure to provide care, both because Davis failed, as Warden, to supervise the medical providers or to transfer Plaintiff in response to the kite.

Defendant Warden Davis is not a medical authority and does not bear responsibility for supervising medical treatment or responding to grievances about medical treatment. *Compare* MDOC Policy Directive 03.02.130 ¶ FF(1) (making the warden the Step-II grievance respondent for custody issues) *with* 03.02.130 ¶ FF(2) (making a designated clinical authority the Step-II

17

grievance respondent for clinical issues).  Moreover, even if he did have such supervisory medical authority, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendant Davis engaged in any active unconstitutional behavior. Accordingly, she fails to state a claim against Davis.

## V.    Procedural Due Process/Right to Petition

Plaintiff appears to allege that Defendants Lebarre and Gaskill mishandled her medical grievances, that the ICF grievance coordinator (not a Defendant) improperly placed her on modified grievance access, and that Lebarre and Gaskill improperly rejected her grievances when she was on modified access.  Plaintiff's allegations arguably implicate her rights to procedural due process and to petition government.

Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of*

18

*Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive her of due process.

Petitioner's right to petition government is not violated by Defendant's failure to process or act on her grievances. The First Amendment "right to petition government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Moreover, Defendants' actions have not barred Plaintiff from seeking a remedy for her grievances. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415-16 (6th Cir. 2014) (citing *N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by her pro se invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982).

Even if Plaintiff was improperly prevented from filing a grievance, her right of access to the courts to petition for redress of her grievances (i.e., by filing a lawsuit) cannot be compromised by her inability to file institutional grievances, and she therefore cannot demonstrate

the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821-24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858-59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio*, 20 F. App'x 469, 470 (6th Cir. 2001).

In light of the foregoing, the Court finds that Plaintiff fails to state claim against Defendants Lebarre and Gaskill for violating her rights to due process and to petition government.

## VI.    Eighth Amendment

Plaintiff alleges that Defendants Corizon Medical, Schmidt, Lebarre, Tripple, Dolittle, Calkins, Beechler, Moore, McIntyre, Gaskill, and Huyge denied her necessary medical care for her GID-related physical issues and her serious mental health needs. She also alleges that Defendants denied her medications and healthcare treatment in retaliation for her grievances.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g., Rouster v. Cty. Of Saginaw*, 749 F.3d 437, 466, 451 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863,

867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

Plaintiff makes limited allegations against certain medical providers. First, her allegations against Defendant Moore, are limited to a single incident. Plaintiff claims that, on August 25, 2019, only two weeks after Plaintiff transferred to ICF, Moore examined him in response to her medical kite. Moore examined the painful lumps in Plaintiff's breast and advised Plaintiff that she would send her report to Defendant PA Huyge for a chart review. Although

22

Nurse Jones told Plaintiff four days later that Moore did not yet send a report to Huyge, Plaintiff's allegation against Defendant Moore fall short of demonstrating that Moore was aware of a substantial risk of serious harm to Plaintiff, much less that Moore disregarded that risk.  At best, Plaintiff's allegation against Defendant Moore may show negligence.  The Court therefore will dismiss Plaintiff's complaint against Defendant Moore for failure to state a claim.

In addition, Plaintiff's allegations against Defendants Saad and Maranka fail to state a claim.  Plaintiff alleges no more than that Defendants Saad and Maranka, who were responsible for providing mental health services to Plaintiff, refused Plaintiff's requests to notify medical providers about the allegedly inadequate physical care provided for Plaintiff's GID.  Plaintiff's allegations fall short of demonstrating that Defendants Maranka and Saad had sufficient knowledge of and were deliberately indifferent to the adequacy of care being provided to Plaintiff by Defendants Huyge, Lebarre, Tripple, Dolittle, Calkins, Beechler, and Gaskill.  The Court therefore will dismiss, for failure to state a claim, Plaintiff's Eighth Amendment claims against Defendants Maranka and Saad.

In contrast, Plaintiff's allegations against Defendant Nurses Tripple, Calkins, and Beechler, who refused to give Plaintiff her prescribed hormones and psychiatric medications and ignored Plaintiff's requests for assistance during rounds, are sufficient to raise an Eighth Amendment claim.  Similarly, Plaintiff's allegation that Defendant Dolittle refused to examine Plaintiff's breast and told Plaintiff that, because she was a man, medical providers need not such an examination suffice to state a claim of deliberate indifference.

In addition, Plaintiff's allegations against Defendants Lebarre and Gaskill are sufficient to state a claim.  Plaintiff repeatedly wrote to Lebarre and Gaskill, who were responsible

for scheduling Plaintiff for visits with Defendant Huyge, yet both Lebarre and Gaskill ignored her requests for months.

Further, Plaintiff's allegations are sufficient to support an Eighth Amendment claim against Defendants Schmidt and McIntyre for failure to train the other medical providers in the care and treatment of GID prisoners.  Given the statements by Corizon medical providers at ICF that they had received no training on the handling of medical issues involving patients with GID over a lengthy period of time, the Court also concludes that Plaintiff has sufficiently alleged an Eighth Amendment claim against Corizon, Inc., for failure to train.  *See Starcher v. Corr. Med. Sys., Inc.,* 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that private corporations that provide traditional state functions like healthcare may be liable under the standard of liability applicable to municipal corporations: when their policy or custom is the moving force behind the constitutional injury) (citing *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011).

## VII.    Intentional Infliction of Emotional Distress

Plaintiff alleges that Defendant Saad committed the state tort of intentional infliction of emotional distress by not accepting Plaintiff's complaints about the treatment of her GID as true and reaching out to the medical superiors of the ICF medical staff.

Claims under § 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Section 1983 does not provide redress for a violation of a state law.  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).  Plaintiff's assertion that Defendant Saad violated state law therefore fails to state a claim under § 1983. Moreover, to the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim, the Court declines to exercise jurisdiction.  In determining whether to retain

supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id.*  Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction against Saad.  Accordingly, Plaintiff's state-law claim against Defendant Saad will be dismissed without prejudice.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court will drop Defendants Oversmith, Traler, and Jex on grounds of misjoinder.  The Court also determines that Plaintiff's federal claims against Defendants Davis, Moore, Maranka, and Saad and will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  In addition, the Court will dismiss without prejudice Plaintiff's state-law claim against Defendant Saad. Further, the Court will dismiss as duplicative the Unknown Party (Chief of Bureau of Health Care Services).  The Court will also dismiss, for failure to state a claim, Plaintiff's due-process and right-to-petition claims against Defendants Lebarre and Gaskill.  Plaintiff's Eighth Amendment claims against Defendants Corizon, Schmidt, Lebarre, Tripple, Dolittle, Calkins, Beechler, Gaskill, Huyge, and McIntyre remain in the case.

An order consistent with this opinion will be entered.


Dated:   September 11, 2020                    /s/ Paul L. Maloney
                                               Paul L. Maloney
                                               United States District Judge