UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA SNIDER,

                Plaintiff,

v.

CORIZON MEDICAL, *et al.*,

                Defendants.

_____/

Case No. 1:20-cv-648

Hon. Paul L. Maloney

## REPORT AND RECOMMENDATION

      This is a *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983 by Joshua Snider.   Plaintiff filed this action on July 16, 2020, when she[1] was a prisoner in the custody of the Michigan Department of Corrections (MDOC).   Plaintiff was released from prison on or about January 22, 2021, and is currently living in Ypsilanti, Michigan.[2]   This matter is now before the Court on motions for summary judgment filed by defendants Corizon Health, Inc., Patricia Schmidt, D.O., and David Huyge, P.A. (collectively referred to as the "Corizon defendants") (ECF No. 34), and defendants Carmen McIntyre, Jody LeBarre, Joleane Tribble, Mary Calkins, Anne Gaskill, and Nicole Doolittle (collectively referred to as the "MDOC defendants") (ECF No. 48).

---

[1] "In the complaint and amended complaint, Plaintiff uses a variety of pronouns, most frequently, the compound pronoun "he/she." For clarity and uniformity, the Court hereafter will use the pronouns 'she' and "her" to reflect the gender identity for which Plaintiff is receiving hormone therapy."   Opinion (ECF No. 10, at fn. 1, PageID.170).

[2] *See* letter dated January 22, 2021 (ECF No. 45).

## I.    Background

Plaintiff's claims arose while she was incarcerated at the MDOC's Ionia Correctional Facility (ICF). Plaintiff sued medical provider Corizon, Inc., Health Unit Manager Jody Lebarre, Dr. [Patricia] Schmidt, Dr. Saad, Physician's Assistant (P.A.) [David] Huyge, Nurse [Mary] Calkins, Nurse Beechler, Nurse Moore, Nurse [Nicole] Dolittle, Nurse Tripple [Joleane Tribble], Health Supervisor [Anne] Gaskill, Mental Health Unit Chief Maranka, Chief of the MDOC Bureau of Health Care Services, Carmen M. McIntyre, ICF Warden John Davis, ICF Assistant Deputy Warden Traler, Resident Unit Manager Oversmith, and Assistant Resident Unit Supervisor Matthrw [sic] Jex.   Opinion (ECF No. 10, PageID.170).

After performing an initial review of the amended complaint, the Court dismissed defendants Maranka, Moore, Oversmith, Saad, Traler "Chief of Bureau of Health Care Services", Davis, and Jex.  *See* Order for partial dismissal (ECF No. 11).   Plaintiff's claims against the remaining defendants are summarized as follows.

According to the amended complaint, the MDOC diagnosed Plaintiff on March 11, 2016, with gender identity disorder (GID), and Plaintiff was classified as a transgender prisoner with female body parts.  In addition, by the age of 17 years, prior to her entry into the prison system, Plaintiff was diagnosed with bipolar disorder, attention deficit hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD).

Plaintiff arrived at ICF on August 13, 2019, and was placed in the START NOW program ["a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting," MDOC Director's Office Memorandum (DOM) 2020-20 (eff. Jan. 1, 2020)]. She was receiving female hormone treatment when she arrived. Shortly after her arrival, Plaintiff began to experience severe migraines and discovered hard, painful lumps in her breast. Plaintiff sent a kite to Defendant Lebarre, describing the painful lumps. On August 25, 2019, [former] Defendant Moore examine [sic] Plaintiff and discovered the lumps. Defendant Moore advised

Plaintiff that the examination report would be sent to Defendant Huyge for a chart review.

On August 29, 2019, Plaintiff began to experience severe chest pain. Nurse Unknown Jones (not a Defendant) examined Plaintiff. Plaintiff asked Nurse Jones about the chart review that Defendant Huyge was supposed to perform. Nurse Jones told Plaintiff that no appointments were set up and Defendant Moore had never filed a report about the examination. Plaintiff experienced an anxiety attack, depression, and thoughts of self-harm.

On an unspecified date in August, Plaintiff sent another kite to Defendant Lebarre, advising that the lumps in her breast had gotten worse and explaining that she needed to be seen. On September 1, 2019, Plaintiff was placed on suicide watch, because of her thoughts of self-harm, arising out of the alleged failures of Defendants Huyge, Lebarre, and Gaskill to provide her medical attention for the breast lumps. Plaintiff was released from suicide watch on September 5, 2019. During the evening medication line, Defendant Tripple refused to give Plaintiff her hormone therapy.

On an unspecified date in August, Plaintiff sent another kite to Defendant Lebarre, advising that the lumps in her breast had gotten worse and explaining that she needed to be seen. On September 1, 2019, Plaintiff was placed on suicide watch, because of her thoughts of self-harm, arising out of the alleged failures of Defendants Huyge, Lebarre, and Gaskill to provide her medical attention for the breast lumps. Plaintiff was released from suicide watch on September 5, 2019. During the evening medication line, Defendant Tripple refused to give Plaintiff her hormone therapy.

Plaintiff again began to experience depression and thoughts of self-harm. She wrote a kite to Defendant Lebarre, explaining that the nurse had refused her hormone therapy. At the morning med line on September 7, 2019, Plaintiff was again denied her hormone therapy, this time by Defendant Calkins. Plaintiff started having hot flashes and migraines, and she began to throw up. Defendant Beechler denied Plaintiff her hormone medications for the third time at the evening med line. Beechler told Plaintiff that she did not like Plaintiff and that Plaintiff needed to die. Plaintiff complains that she experienced another panic attack.

After five days of suffering migraines, anxiety attacks, depression, hot flashes, and increasingly painful lumps in her breast, Plaintiff finally was issued her hormone medication. Plaintiff alleges that Defendants Lebarre, Tripple, Beechler, and Calkins engaged in intentional infliction of emotional distress and were deliberately indifferent to Plaintiff's serious physical and mental illness over the five-day period. Plaintiff wrote a grievance against Lebarre, Huyge, Beechler, and Tripple.

On September 25, 2019, Plaintiff met with Defendant Nurse Dolittle, who refused to examine the lumps in Plaintiff's breast. Dolittle also stated that Plaintiff was a man and that Defendant Huyge therefore had no obligation to examine Plaintiff's breasts. Plaintiff experienced an anxiety attack with chest pains. Later that afternoon, Defendant Tripple refused to issue Plaintiff her psychiatric medications. Tripple told Plaintiff that she had a penis and needed to act like it. Plaintiff again experienced depression and thoughts of self-harm.

Plaintiff wrote to the chief of Corizon, Inc. on September 27, 2019, complaining about the lack of care from Defendants Schmidt, Lebarre, and Huyge. That same day, she wrote a kite to Defendants Lebarre, Gaskill, and Huyge, advising them that her GID was not being properly treated and that Defendant Dolittle had refused to examine her. Nurse Sikkema (not a Defendant) examined Plaintiff on September 30, 2019. Sikkema felt the lumps in Plaintiff's breast and told Plaintiff that he would send the medical chart to Defendant Huyge.

On October 6, 2020, while Defendant Calkins was making medical rounds, Plaintiff informed Calkins that she was having chest pain. Calkins ignored Plaintiff.

Plaintiff wrote to Defendant Huyge on October 10, 2019, complaining that Huyge had not seen Plaintiff, despite being aware of the issues and serious needs Plaintiff faced. Plaintiff was examined by Nurse Fletcher (not a Defendant) on October 23, 2019. Fletcher performed a full physical, weighed Plaintiff, felt the lumps in Plaintiff's breast, and advised Plaintiff that she would send the medical chart to Defendant Huyge.

Plaintiff wrote to [former] Defendant Warden Davis on November 5, 2019, stating that she was a GID prisoner on female hormones whose serious medical needs were being ignored by medical staff. Plaintiff asked to be transferred to another facility to get proper medical treatment.

Plaintiff alleges that she continued to be denied her psychiatric medications. On November 13, 2019, Plaintiff had a seizure, and her right palm and pinky finger went completely numb.

On November 19, 2019, Defendant Calkins issued Plaintiff's psychiatric medications, but they had been crushed and floated in the water. Plaintiff spoke with Dr. Shafer (not a Defendant) about the crushed medication on November 20, 2019. Dr. Shafer investigated, allegedly prompting health care officials to lie and say that they had found a stash of psychiatric medications in Plaintiff's cell. Plaintiff alleges that Defendants lied in retaliation for Plaintiff having filed grievances and kites.

4

After three months of attempting to get an appointment with Defendant Huyge, Plaintiff finally met with Huyge on November 22. Defendant Huyge informed Plaintiff that the GID issue was new to all of the ICF health care officials, including himself, Lebarre, Tripple, Dolittle, Beechler, and Calkins. Huyge told Plaintiff that none of them were trained in the disorder and that Defendant Schmidt had been made head of the Gender Dysphoria Committee in Lansing. Defendant Huyge ordered lab tests and weighed Plaintiff, but Huyge refused to check the lumps in Plaintiff's breast. Later that night, Plaintiff suffered another seizure. Plaintiff's right hand became completely numb. Plaintiff told an unknown correctional officer that she needed immediate medical attention, but she was ignored. Plaintiff wrote kites to Defendant Huyge, Lebarre, and Gaskill, telling them that she could no longer feel her right hand.

On December 4, 2019, Nurse Fletcher examined Plaintiff's hand. Fletcher informed Plaintiff that she would send Plaintiff's medical chart to Defendant Huyge.   Plaintiff wrote a kite to [former] Defendant Maranka, the head of the ICF mental health unit. Plaintiff asked Maranka to email Dr. Schmidt in Lansing, so that Plaintiff could get proper medical attention.

Plaintiff was scheduled to have a nurse callout on December 12, 2019, so that her blood draws could be done. Plaintiff was never called out and never saw a nurse. The following day, Plaintiff wrote to Defendant Health Care Supervisor Gaskill, complaining that she had not had her lab work completed. Later that day, she had another panic attack. After eight days of panic, depression, and thoughts of self-harm, Plaintiff finally had her blood drawn on December 20, 2019.

Plaintiff wrote Defendant Lebarre on December 21, 2019, complaining that she had been trying to get proper medical care for three months, but nothing had been done about the lumps in her breast and her other medical issues. Plaintiff wrote to Defendant Huyge on December 31, 2019, informing him that she was supposed to have been seen on December 4, 2019, and asking why she was being denied medical care.   .   .   .

On January 6, 2020, Plaintiff wrote a complaint to Defendant MDOC Chief of Health Care Services McIntyre, advising her of the ICF Defendants' failures to treat Plaintiff and complaining about their lack of training to do so. Plaintiff also complained that Defendant Schmidt had failed to take action on Plaintiff's medical needs, despite being fully aware of the serious risks faced by Plaintiff.   .   .   .

On January 9, 2020, Plaintiff wrote a kite to Defendant Lebarre, asking her to arrange a telemedicine visit with Dr. Schmidt. On January 17, 2020, Plaintiff was placed on modified grievance access.

On both January 23 and January 30, 2020, Plaintiff had a scheduled nurse callout to see the GID doctor, to address her medical issues. Both callouts were cancelled. Plaintiff had another anxiety attack with chest pain. She submitted grievances on Defendants Lebarre, Huyge, and Gaskill on January 26 and February 1, 2020, complaining that Defendants were intentionally making her suffer. The grievance was denied. In addition, Plaintiff remained on modified grievance access.

On February 3, 2020, after five months of complaints, Plaintiff finally saw PA Donna Rohr (not a Defendant). Rohr performed a full physical, to try to determine why Plaintiff's weight kept changing and her breast hurt. Rohr read the lab reports to Plaintiff, explaining that Plaintiff's T-block hormone level was high and other hormone was low. Rohr told Plaintiff that she would convey the information to Dr. Schmidt and recommend a different hormone therapy.

Plaintiff wrote Defendant Lebarre on February 9, 2020, advising Lebarre that Plaintiff's hormone level was low and asking Lebarre to email Defendant Schmidt so that Plaintiff could be placed on a different hormone therapy.

Plaintiff saw Nurse Fletcher of February 18, 2020, for follow-up on the numbness in Plaintiff's right hand. Plaintiff complains that Defendant Huyge had been aware of the numbness for some time but failed to address it. Nurse Fletcher advised that she would send Plaintiff's medical chart to Defendant Huyge.  .  .  .

Plaintiff wrote a kite to Defendants Lebarre, Gaskill, and Huyge on February 29, 2020, informing them that she was losing breast tissue.  .  .  .

Plaintiff saw Defendant Huyge on March 9, 2020. Plaintiff explained all of her issues, including the numbness in her right hand. Defendant Huyge performed no examination or tests. Plaintiff had another severe anxiety attack after the visit.  .  .  .

Defendant Huyge made medical rounds on the unit on March 27, 2020. Plaintiff asked Defendant Huyge to contact Dr. Schmidt or someone from the GID committee about Plaintiff's T-blocker-level being high. Defendant Huyge laughed at Plaintiff and refused to help.

Plaintiff wrote another kite to Defendants Lebarre, Gaskill, and Huyge on May 30, 2020. Plaintiff again raised the issue of her T-blocker-level being high, her hormones being low, her breast becoming worse and more painful. Plaintiff asked to be seen by Dr. Schmidt or another specialist. On June 1, 2020, Defendant Lebarre finally agreed to reach out to Defendant Schmidt so that Plaintiff could receive proper medical treatment for her conditions.  .  .  .

On July 9, 2020, Plaintiff finally saw Defendant Huyge again. Huyge read Plaintiff's December 20, 2021 lab draws back to Plaintiff. Despite the fact that the lab draws showed low female hormones and high t-block-levels, no action was taken. Defendant Huyge refused to examine Plaintiff's painful breast.

Plaintiff contends that Defendants Corizon, McIntyre, and Schmidt failed to respond to her repeated attempts to obtain health care and failed to train ICF medical personnel in the care of prisoners with GID who were taking hormones. Plaintiff also alleges that these Defendants failed to train and supervise Defendant ICF medical providers Lebarre, Tripple, Dolittle, Calkins, Beechler, Moore, and Gaskill, despite direct knowledge that the ICF health care Defendants did not know how to treat prisoners with GID who were undergoing hormone treatment, including Plaintiff. Further, Plaintiff alleges that Defendants Corizon, McIntyre, and Schmidt had direct knowledge of Plaintiff's ongoing condition, but refused to take action to correct it.

Plaintiff contends that Defendants' actions violated her rights by retaliating against her for filing grievances and kites, in violation of the First Amendment. She also alleges that Defendants' actions demonstrated deliberate indifference to her serious medical needs and conditions of confinement, in violation of the Eighth, and Amendment. Further, Plaintiff alleges that Defendants violated the Fourteenth Amendment, presumably the Due Process Clause, by mishandling or rejecting her grievances.  .  .

*Id*. at PageID.170-179 (footnotes omitted).

## II.    Defendants' motions for summary judgment

### A.    Legal standard for summary judgment

Defendants seek summary judgment because plaintiff failed to exhaust her administrative remedies prior to filing this lawsuit.  Plaintiff filed a response to the Corizon defendants' motion (ECF No. 43).  While plaintiff did not file a response to the MDOC defendants' motion, the Court will consider her response (ECF No. 43) to the extent it applies to both motions.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).   Rule 56 further provides that a party asserting that a fact cannot be or is

genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties'

burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.   Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).   "In deciding a motion for summary judgment,

the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

party."   *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.    Failure to Exhaust

### 1.    Exhaustion requirement

The Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996)

(PLRA) provides that a prisoner bringing an action with respect to prison conditions under 42

U.S.C. § 1983 "or any other Federal law" must first exhaust available administrative remedies.

*See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731

(2001).   A prisoner must exhaust available administrative remedies, even if the prisoner may not

be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*,

534 U.S. at 520; *Booth*, 532 U.S. at 741.   One reason for creating prisoner grievance procedures

under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes
> concerning the exercise of their responsibilities before being haled into court.   This
> has the potential to reduce the number of inmate suits, and also to improve the
> quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007).   In order to properly exhaust administrative remedies,

prisoners must complete the administrative review process in accordance with the deadlines and

other applicable procedural rules.   *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

"Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to

'properly exhaust.'"   *Jones*, 549 U.S. at 218.   Finally, even if a prisoner complies with the

grievance procedures, the grievance must give fair notice of the misconduct or mistreatment as

measured against the claim alleged in the prisoner's complaint.   *See Bell v. Konteh*, 450 F.3d 651,

654 (6th Cir. 2006).

## 2.    MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances.

*See* Policy Directive 03.02.130 (effective March 18, 2019).   A prisoner must first attempt to

resolve a problem with the staff member within two business days of becoming aware of the

grievable issue, unless prevented by circumstances beyond his or her control.   *Id.* at ¶ Q.   If the

issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within

five business days after the grievant attempted to resolve the issue with appropriate staff.   *Id.* at

¶¶ Q and S.   The Policy Directive provides the following directions for completing grievance

forms:

> The issues should be stated briefly but concisely.   Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).   Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ S (emphasis in original).   The prisoner must send the Step I grievance to the appropriate grievance coordinator.   *Id.* at ¶ W.   If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.   *Id.* at ¶ DD.   Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section.   *Id.* at ¶ HH.

### C.    The Corizon defendants

The Corizon defendants have set out plaintiff's grievance history and explained that she did not properly exhaust any grievances against them.   *See* Corizon defendants' Brief (ECF No. 34, pageID.271-272); MDOC Prisoner Step III Grievance Report (ECF No. 34-1); Richard D. Russell Decl. (ECF No. 34-3).    In her response, plaintiff states that one grievance, ICF-19-19-1472-28I ("1472") (dated September 25, 2019), "was well exhausted at Step 3 on 10-24-2019 before Plaintiff filed Herein [sic] civil action."   Joshua Snider Decl. (ECF No. 43).

The Corizon defendants addressed grievance 1472 (incorrectly identified as ICF-19-09-1472-1472), pointing out that,

> The Step I grievance was received on September 6, 2019, which alleges failure to train relating to GID prisoners on female hormones. The grievance names "health care chief and health care staff."   This grievance was rejected at Step I for failure to resolve the issue with staff prior to submitting his grievance in violation of ¶Q of MDOC's grievance procedure. (Exhibit B, p. 22-23). Plaintiff only attempted to resolve this issue by speaking with an unnamed nurse. The rejection

was upheld at Step II.   On October 24, 2019, this grievance was rejected at Step
III in accordance with PD 03.02.130. (Exhibit B, p. 19).

Corizon Defendants' Brief at PageID.274.   Neither the Corizon defendants nor plaintiff provided

a copy of the grievance 1472.   However, grievance 1472 is in the record (ECF No. 49-3,

PageID.402-406), having been filed as an exhibit to the MDOC defendants' motion for summary

judgment.

Portions of grievance 1472 are illegible.   The incident date appears to be either

August 20 or August 30, 2019.   Grievance 1472 at PageID.405.   Either of these dates make no

sense, because plaintiff lists the date he completed the grievance as "8-3-2019".   *Id*.   Plaintiff

stated that she tried to resolve the issue by talking to an unidentified nurse on "9-1-2019."   *Id*.

The grievance is not directed at any of the Corizon defendants.   As discussed, plaintiff referred to

"Health care cheif [sic] an [sic] Health care staff."   *Id*.   Plaintiff's claim is that the Health Care

Chief and Health Care Staff "will not treat me, am a G.I.D. inmate on Female Hormones!!!", that

she has lumps in her breast, that she is losing weight, and that "Health Care Staff" at ICF are

untrained when it comes to G.I.D. inmates.   *Id*.   The MDOC rejected grievance 1472 because

plaintiff did not attempt to resolve the grievance as required by the policy directive and advised

her to kite Health Care.   *Id*. at PageID.406. The rejection was upheld at Steps II and III.   *Id*. at

PageID.402-404.   Based on this record, plaintiff did not properly exhaust grievance 1472.

In addition to the rejection, the possible incident dates of August 20 or August 30,

2019, do not correspond with any particular incident alleged against the Corizon defendants.   As

discussed, *supra*, plaintiff alleged that on August 25, 2019, former defendant Moore examined

plaintiff and discovered lumps in her breast, and that on August 29, 2019, Nurse Jones (not a

defendant in this case) examined plaintiff after she experienced severe chest pain.   *See* Opinion at PageID.171.

Based on this record, plaintiff did not properly exhaust a grievance against defendants Corizon, Inc., Dr. Schmidt, or P.A. Huyge for the claims alleged in her amended complaint. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93.   Accordingly, their motion for summary judgment (ECF No. 34) should be granted.

### D.    The MDOC defendants

The MDOC defendants also seek summary judgment because plaintiff failed to exhaust any grievance.   The MDOC defendants have identified two grievances which plaintiff exhausted through Step III prior to filing her complaint. grievance 1472, and ICF-19-09-1540-28b ("1540").   As discussed, *supra*, plaintiff failed to properly exhaust grievance 1472.   For these same reasons, plaintiff cannot rely on grievance 1472 to support her claim against the MDOC defendants.

In addition, the MDOC defendants point out that plaintiff failed to properly exhaust grievance 1540, which was rejected at Step I, with the rejection upheld at Steps II and III.   *See* Grievance 1540 (ECF No. 49-3, PageID.397-401).   The MDOC defendants further explain:

> ICF-19-09-1540-28b was rejected because the grievance was vague. (Ex. 2 at 17–18.) [PageID.400-401]   It is unclear from the face of this grievance what Snider was complaining about, and she did not make any allegations in that grievance related to the claims raised in this complaint.

MDOC defendants' brief (ECF No. 49, PageID.369).   In this regard, plaintiff made no claim against any of the defendants, stating the problem as: "Equal protection, Freedom of Speech, Inhumane treatment, Discrimination!!!"; writing to the chaplain; "Got to praktis [sic] my RELIGION!"; prisons have to let inmates practice their religion of choice; and that "[t]his" is a

12

violation of her constitutional rights.   Grievance 1540 (PageID.400).   As the MDOC defendants point out, this grievance does not address any of the incidents alleged in plaintiff's amended complaint.

Based on this record, plaintiff did not properly exhaust a grievance against defendants Carmen McIntyre, Jody LeBarre, Joleane Tribble, Mary Calkins, Anne Gaskill, or Nicole Doolittle for the claims alleged in her amended complaint. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93.   Accordingly, their motion for summary judgment (ECF No. 48) should be granted.

### E.    Nurse Beechler and Amber Johnson

As discussed, plaintiff sued "Nurse Beechler".   Alicia Lane, an attorney with the Michigan Department of Attorney General (the MDOC defendants' counsel), entered a "limited attorney appearance" for defendant Unknown Beechler for purposes of the Prisoner Civil Rights Litigation Early Mediation Program on September 29, 2020.   However, Nurse Beechler's name has been removed from the current docket sheet, which reflects that Attorney Lane was terminated as counsel for defendant Amber Johnson on October 8, 2020, when the case was removed from mediation.   The Court infers that Nurse Beechler is now known as Amber Johnson, because Johnson acknowledged the waiver of service addressed to "Unknown Beechler RN" (ECF No. 38). However, nothing in the record explicitly states that RN Beechler and Amber Johnson are the same person.   In addition, the MDOC defendants' counsel has failed to appear and move for summary judgment on behalf of this defendant, under either the name Beechler or Amber Johnson.   The MDOC defendants' counsel should be directed to clarify the record by explaining why Amber

Johnson signed the waiver for defendant Beechler and why counsel has taken no action with respect to either Beechler or Amber Johnson.

### III.    Recommendation

For the reasons set forth above, I respectfully recommend that defendants Corizon, Inc., Dr. Schmidt, and P.A. Huyge's motion for summary judgment (ECF No. 34) be **GRANTED** and that they be **DISMISSED** from this action

I further recommend that defendants Carmen McIntyre, Jody LeBarre, Joleane Tribble, Mary Calkins, Anne Gaskill, or Nicole Doolittle's motion for summary judgment (ECF No. 48) be **GRANTED** and that they be **DISMISSED** from this action.

I further recommend that the MDOC defendants' counsel be **DIRECTED** to clarify the record by explaining why Amber Johnson signed the waiver for defendant Beechler and why counsel has taken no action with respect to either Beechler or Amber Johnson.


Dated: August 2, 2021                          /s/ Ray Kent
                                               RAY KENT
                                               United States Magistrate Judge


**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.   All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).